

# COURT OF APPEALS

**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 2-09-367-CV

IN THE INTEREST OF J.H., A CHILD

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

In two issues that concern evidentiary sufficiency, appellant J.H. (Mother) appeals the trial court's termination of her parental rights concerning her son, J.H.[2] We affirm.

------------

[1]*See* Tex. R. App. P. 47.4.

[2]To protect the identity of the parties involved in this appeal, we will identify them through initials only. *See* Tex. Fam. Code Ann. § 109.002(d) (Vernon 2008); Tex. R. App. P. 9.8(b).

**Background Facts**

Mother gave birth to J.H. in March 2008 when she was twenty-three years old. In August 2008, Deborah Long, who works for Child Protective Services (CPS), received anonymous allegations about Mother's inappropriate behavior concerning J.H., including that Mother was using drugs and shook J.H. when he cried.[3] The referral that Long received gave the wrong address for Mother, and for a while, Long could not find Mother or J.H. While Long was looking for Mother, Long learned that Mother had worked at a strip club but had left because she was confrontational and aggressive toward the club's employees.

Months later, Long discovered that Mother was in jail on a charge of aggravated assault with a deadly weapon. Mother gave CPS the name of a trailer park where J.H. was staying, and CPS eventually learned that Marsha Spinks, an acquaintance from the trailer park whom Mother had known for seven or eight months, was caring for J.H. Mother gave CPS a phone number for Spinks.

Long found J.H. with Spinks. J.H. was clean, had food, did not have any bruising, and appeared to be happy and healthy. Thus, CPS initially determined that J.H. was not in immediate danger. However, Long later learned that Spinks had been involved in a prior CPS case that concerned drug use and that CPS

---

[3]Long was not able to confirm the truth of these allegations.

had a reason to believe that the drug allegation in that case was true.[4]  Although Spinks passed a drug test and agreed to not use drugs, CPS removed J.H., who was eight months old at the time, from the Spinkses' care.

Long asked Mother whether she had relatives who could care for J.H., and although Mother gave Long names of her relatives, she did not say that any of them could care for him.  Thus, CPS placed J.H. with a foster family.

In November 2008, the Texas Department of Family and Protective Services (the Department) filed a petition that asked for termination of Mother's parental rights if reunification of J.H. with Mother could not be achieved.[5]  The Department attached an affidavit to its petition that detailed Mother's extensive history with the Department regarding her three older children and the reasons for the Department's concerns about J.H.  Based on the petition, the trial court signed an order naming the Department as J.H.'s temporary sole managing conservator.

In December 2008, the Department filed a service plan to help Mother meet J.H.'s needs and to "ensure that [J.H.] receive[d] safe and proper care."

---

[4]Mother testified that she did not know of Spinks's CPS history or of Spinks's drug use.  She said that the Spinkses were like family to her and that she left J.H. with the Spinkses because she trusted them, J.H. had bonded with them, and they thought of J.H. "as their own" and were very protective of him.

[5]The Department amended its petition in February 2009 to correct the name of J.H.'s father.  Mother initially provided CPS with the wrong name for J.H.'s father.  Later, she told CPS that the name that she had given was one that she had made up and then gave CPS the correct father's name.  J.H.'s correct father, Jose H., voluntarily relinquished his parental rights to J.H.

3

Mother got out of jail in the same month. At that time, the Department's plan for J.H. was his reunification with Mother.

In April 2009, the Department filed a service plan update relating, among other facts, that J.H. was developing well and that Mother had completed parenting classes and a psychological evaluation but did not have suitable housing or employment. The Department's goal changed from reunification to termination of Mother's rights and adoption of J.H. by another family.

Mother generally denied the allegations contained in the Department's petition. At the end of the jury trial in September 2009, the jury found that (1) Mother had engaged in conduct or knowingly placed J.H. with persons who engaged in conduct that endangered his physical or emotional well-being, (2) Mother previously had her parent-child relationship terminated with respect to another child based on a finding that her conduct violated section 161.001(1)(D) or (E) of the family code, and (3) termination of Mother's rights to J.H. is in his best interest. The trial court signed a Decree of Termination that incorporated the jury's findings. Mother filed notice of this appeal.

**The Law Concerning Termination of Parental Rights**

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for

4

courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (Vernon 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re M.C.T.*, 250 S.W.3d 161, 167 (Tex. App.—Fort Worth 2008, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (Vernon Supp. 2009); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.206(a) (Vernon 2008). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (Vernon 2008). Due process demands this heightened standard. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002).

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a factfinder could

5

reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.*

In reviewing the evidence for factual sufficiency, we must give due deference to the jury's findings and not supplant its decision with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief of the findings necessary for termination. Tex. Fam. Code Ann. § 161.001; *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

**Basis for Termination Under Family Code Section 161.001(1)**

In her first issue, Mother contends that the evidence is legally and factually insufficient to show that she engaged in conduct or knowingly placed J.H. with persons who engaged in conduct that endangered his physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(E). However, Mother does not challenge the jury's finding that she previously had her parental rights terminated with respect to another child because her conduct violated family code section 161.001(1)(D) or (E). Such a finding comprises an adequate basis for termination. *See id.* § 161.001(1)(M).

6

"Along with a best interest finding, a finding of only one ground alleged under section 161.001(1) is sufficient to support a judgment of termination." *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.). Thus, to be successful on appeal, Mother must establish that the jury's findings on all of the Department's pleaded grounds are unsupported by the evidence. *See Fletcher v. Dep't of Family & Protective Servs.*, 277 S.W.3d 58, 64 (Tex. App.—Houston [1st Dist.] 2009, no pet); *In re B.K.D.*, 131 S.W.3d 10, 16 (Tex. App.—Fort Worth 2003, pet. denied) (holding that because the jury found four grounds for termination under section 161.001(1) and the father challenged only three of those grounds, we were not required to address his argument that the evidence was insufficient on the three challenged grounds); *see also In re S.A.G.*, No. 02-09-00125-CV, 2010 WL 1006301, at *5 (Tex. App.—Fort Worth Mar. 18, 2010, no pet.) (mem. op.) (overruling a parent's issue because although the parent challenged the trial court's finding under section 161.001(1)(E), the parent did not challenge a finding under section 161.001(1)(M)). Because an unchallenged statutory basis supports the termination of Mother's parental rights to J.H., we overrule Mother's first issue.[6]

---

[6]Although appellant does not challenge the jury's finding under section 161.001(1)(M), we note that the evidence supports that finding. The trial court admitted termination orders regarding Mother's three other children, and each of the orders included a ground under section 161.001(1)(D) or (E).

7

**J.H.'s Best Interest**

In her second issue, Mother argues that the evidence is factually insufficient to prove that termination of her parental rights to J.H. is in his best interest. *See* Tex. Fam. Code Ann. § 161.001(2).

**Best interest standards**

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2008). A jury could consider the following factors (among several others) in determining whether a parent is willing to provide a child with a safe environment: the child's age and physical and mental vulnerabilities; the frequency and nature of out-of-home placements; the magnitude, frequency, and circumstances of the harm to the child; the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; whether there is a history of substance abuse by the child's family or others who have access to the child's home; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and whether an adequate social support system consisting of an extended family and friends is available to the child. *Id.* § 263.307(b).

Other factors that a jury may use in determining the best interest of the child include the desires of the child; the emotional and physical needs of the child and danger to the child now and in the future; the parental abilities of the individuals seeking custody; the programs available to assist these individuals to promote the best interest of the child; the plans for the child by these individuals or by the agency seeking custody; the stability of the home or proposed placement; the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).[7] These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27.

Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

---

[7]The trial court's charge to the jury defined "best interest of the child" by reciting the *Holley* factors.

9

**Evidence relating to J.H.'s best interest**

The jury had the following evidence to consider while it balanced the best interest factors listed above.

**Mother's past and current relationships**

Mother had an unhappy childhood and began running away from home when she was twelve or thirteen years old. Thus, she does not have much support from her family. She gave birth to her first child when she was seventeen years old and has been pregnant eight times; she has had four children, three miscarriages, and one abortion.

On one occasion when she had run away, Mother met her first child's father, Christopher Cook, when he was twenty-two years old and she was sixteen years old. Cook introduced Mother to drugs such as acid and ecstasy, and when Cook became involved with one of Mother's friends, Mother "overdosed a little bit" on acid. Mother also used methamphetamine when she was sixteen years old. When Mother found out that she was pregnant with Cook's child, who is now named C.Y., she went to a maternity home, where she planned to give the child up for adoption to Joan Y.

Joan Y. had a good relationship with Mother until Mother changed her mind about allowing Joan Y. to adopt C.Y. after C.Y.'s birth. CPS removed C.Y. from Mother's care and eventually placed him with Joan Y. A court terminated Mother's parental rights to C.Y. based on her endangering him (or allowing others to endanger him) and failing to support him, and Joan Y. adopted him.

10

After Mother miscarried another baby, she met William Stolte while on a road trip with her friends. She conceived a baby with him, but he left Mother toward the end of her pregnancy. Mother's parental rights to the baby that she conceived with Stolte, W.H., were terminated on endangerment and constructive abandonment grounds. Mother later became pregnant with Gabriel Alderete's child; Mother and Alderete, who Mother met while working in a strip club, had an on-and-off relationship for four or five years. While with Alderete, Mother became involved with another man and began selling methamphetamine and using drugs again. A court terminated Mother's parental rights to her and Alderete's child, J.B., on endangerment and constructive abandonment grounds.

Later, Jose H. and Mother conceived J.H. Mother was still working in a strip club when she was involved with Jose H. Like Mother and Alderete, Mother and Jose H. had an off-and-on relationship; according to Dr. Nichelle Wiggins, who gave mother a psychological evaluation, they "would have conflicts and separate" and then reunite again "in order to have more conflict[s] and separate."[8] Mother and Jose H. had a fight in October 2008, and Mother went to jail for aggravated assault with a deadly weapon because of that incident.

---

[8]Dr. Wiggins, a licensed clinical psychologist, told the jury that at CPS's request, she met with Mother to assess Mother's emotional and cognitive status. At the beginning of Dr. Wiggins's evaluation of her, Mother "constantly was texting." After Dr. Wiggins told Mother that she thought Mother was not taking the evaluation seriously, Mother stopped sending text messages.

11

In late 2008, Mother began a relationship with Omar Ornelas, who she met while she was at working as a dancer at Illusions, which is a strip club.[9] But according to Dr. Wiggins, Mother was still talking to Jose H. while she was involved with Ornelas. In fact, Jose H. watched J.H. for Mother (before J.H.'s removal from the Spinkses' residence) while she dated Ornelas. Mother said that although Ornelas was her boyfriend, she "still loved [Jose H.] a lot."

Ornelas has a job but resides with his parents. He described his relationship with Mother as "strained" because of Mother's case involving J.H. Ornelas provided diapers for J.H. while he was staying with the Spinkses and allowed Mother to use his car to go to appointments while he worked during the day.

**Mother's history of drug and alcohol abuse**

Mother admitted to CPS that she had used and sold drugs in the past, had drunk alcohol excessively while working at strip clubs to cope with the work environment, and had cared for J.H., before his removal and placement with foster parents, while she was drunk. Mother has continued at times since she was sixteen years old to use and deal illegal drugs; she has also associated with between five and ten men who used and dealt drugs.

Although Mother said that she tried to stop using drugs when she discovered that she was pregnant with her children, she admitted that she used

---

[9]According to Dr. Wiggins, Mother has "only been either a waitress or a dancer" at strip clubs.

and/or dealt drugs during the time that she was caring for her older children. Mother started drinking alcohol when she was nineteen years old and continued drinking because she "hated her work" at a strip club. Mother told Dr. Wiggins in January 2009 that she drank alcohol every day that she worked but that she did not have a problem with alcohol.

Mother claimed that during the pendency of this case, she was not using illegal drugs but only drinking alcohol. She said at trial, in contrast to what she told Dr. Wiggins, that she had a problem with alcohol and that although she has tried to stop drinking, she "drank too much" a couple of months before the trial, and "it almost cost [her a] relationship." She passed a hair follicle drug test about a week before the trial in September 2009; the test would have revealed any illegal drug usage within three months prior to the test. She also passed two random drug tests in January and April 2009.

Lindsay Sultana, a CPS employee who worked on J.H.'s case from November 2008 until April 2009, said that Mother told her that she had not used drugs for more than a year. Sultana did not have any evidence that Mother was continuing to use illegal drugs during J.H.'s case, but Sultana said that Mother was continuing to drink alcohol, which Sultana considers to be a drug. Mother told Sultana that she drank alcohol "to deal with the nature of her job." Sultana admitted that she did not know how often Mother drank alcohol. However, Sultana explained that Mother has not successfully availed herself to

drug treatment programs and counseling programs since giving birth to her first child in 2001.

Abigail Flores, who replaced Sultana as the caseworker for J.H.'s case in April or May 2009, expressed her concern that Mother valued drinking alcohol more than J.H.'s needs. Although Flores said that she was not concerned about Mother's drug abuse, she was concerned about her alcohol consumption.

Mary Theuer, a substance abuse counselor at Community Addiction Treatment Services (CATS), testified that CPS referred Mother to CATS (as part of Mother's service plan) and that CATS scheduled Mother for twenty-eight two-hour group counseling sessions, at a rate of three to five sessions per week, and four individual sessions. Mother acknowledged during her initial CATS assessment that she had used LSD, cocaine, and methamphetamine. However, Mother never attended as many as three CATS sessions in one week, and she did not successfully complete the program because she only attended six out of twenty-eight group sessions.

Theuer said that substance abuse, including the use of alcohol, causes parents to lack cognitive skills or reflexes necessary to care for a child. Theuer opined that Mother's working in a strip club was not a positive surrounding if she was trying to end substance abuse. Mother testified that she has worked with

dancers who use drugs.  Mother admitted that working in a strip club is risky for her because the club serves alcohol.[10]

Mother said that she just "didn't want to do" CATS because attending CATS forced her to see people who she had sold drugs to and was trying to stay away from.  However, Mother admitted at trial that she had acknowledged at a previous hearing that completing drug treatment was important and that she was told at that hearing that her rights might be terminated if she did not complete the treatment.

Tiwana Bell, a licensed clinical social worker, met with Mother in January 2009.[11]  Mother told Bell about her problem with abusing alcohol, her poor behavior when she did so, and her history of using illegal drugs.  Mother told Bell that she was not attending CATS treatment because it was focused too much on "other drugs and she wanted something more specific to alcohol."  However, the record does not show that Mother sought treatment for her alcohol consumption through other programs.  Bell indicated that the CATS sessions would have benefited Mother because "[a]cross the board, chemical dependency has a lot of things in common."

---

[10]Dr. Wiggins was also concerned about Mother's decision to continue working in a strip club because "when a person has a drug or alcohol history and there [are] addiction issues," the person should not remain "in that type of environment where there is constant temptation, possible relapse."

[11]CPS originally scheduled Mother to complete twelve sessions with Bell. Mother completed eight sessions for a total of seven hours, and then Bell discharged Mother from counseling because Mother "just wasn't progressing."

Ornelas, Mother's boyfriend at the time of trial, does not use illegal drugs but drinks alcohol. He said that Mother had drunk alcohol in the year before the trial but that it was "very cut back from when [they] first met." In fact, Ornelas testified that he had not seen Mother drink any alcohol or smelled alcohol on her within a couple of months before the trial began. However, Ornelas admitted that his job causes him to be out of town for two to three weeks at a time and that he only sleeps in Fort Worth on four to six days per month. Thus, the jury could have determined that Mother drank alcohol when Ornelas was not with her.

**Mother's compliance with the service plan**

The Department's service plan listed goals related to Mother's parenting abilities and gave her several tasks to complete, at no cost to her, such as participating in anger management and parenting classes. The plan also required her to maintain appropriate housing and employment. Sultana gave the plan to Mother and discussed it with her on December 11, 2008, while Mother was in jail for the aggravated assault charge.[12] Sultana told Mother that completion of the plan was "important to show CPS that [Mother] was motivated to get her child back." Sultana testified that Mother understood the importance of completing the plan's requirements.

Mother complied with the plan by taking anger management and parenting classes, completing a psychological evaluation, and regularly visiting J.H.

---

[12]Sultana also discussed the plan with Mother on other occasions.

16

But Mother violated the plan by being discharged by the CATS program for nonattendance, by failing to provide proof that she maintained stable employment, and by failing to obtain appropriate housing.[13] Mother said that she tried to complete the services that CPS created for her and that she had transportation available to do so, but she admitted that she did not have a good excuse for why she failed to do so.

Flores, who said that she always initiated contact with Mother and that Mother never contacted her, spoke to Mother on more than one occasion about finishing the plan by returning to drug treatment and to individual counseling with Bell. Flores testified that if Mother had returned to counseling to complete more of the service plan, she would have asked the court to give Mother more time to do so. But Mother did not express interest in completing her service plan.

**Mother's abusive behavior**

Sultana testified that in 2002, Mother allegedly fought with a man and stabbed him in his hand. Also, in 2005 or 2006, Mother beat a man's truck with a baseball bat. Mother admitted that she had assaulted three or four men.

Fort Worth Police Department Officer Steven Howze testified that in October 2008, he responded to a dispatch regarding "a cutting" at an apartment complex. When he arrived, he saw stab wounds near Jose H.'s (J.H.'s father's) shoulders and scratches on his neck; Jose H. said that he had been babysitting

---

[13]Mother also did not complete drug-use therapy or other portions of service plans during the CPS cases for her three other children.

17

J.H. at a motel room and that Mother had caused the wounds while J.H. was lying in bed.

Officer Howze found Mother, who smelled like alcohol, at the motel. Mother admitted that she had been drinking alcohol, that she had stabbed Jose H. with a knife, and that she had hit him with a glass, but she told Officer Howze (and also later told Sultana) that she had acted in self-defense. According to Officer Howze, Mother was arrested for aggravated assault with a deadly weapon and taken to jail.

Mother acknowledged that the incident with Jose H. occurred but told the jury that Jose H. had tried to take J.H. away from the motel room, had thrown her on a bed, and had choked her before she stabbed him with the knife. Mother denied that she was arrested because of the incident and said that the charge related to the incident was dismissed. According to Mother, her incident with Jose H. was the only violence that she exposed J.H. to. Mother said that she had taken violence "out of [her] life by not associating with [Jose H.]."[14]

Bell asked about Mother's stabbing Jose H., and Mother told Bell that "she got into an altercation and it had gone back and forth and he had done some things to her, but then she did some things to him and she was the one who wound up arrested." According to Bell, Mother also said that she had physical

---

[14]Mother said that she ended her romantic relationship with Jose H. two days before J.H. was born but that she was still involved with Jose H. because he is J.H.'s father.

altercations with Ornelas.[15]   Bell concluded that Mother was a "contributor to violence in her relationships."   Bell wanted Mother to address her past relationships and domestic violence issues by choosing better relationships.

**Mother's parenting abilities as reflected from her past and present choices**

In 2002, Mother pled guilty to theft, was convicted of that charge, and received fifteen days' confinement as her punishment.   In 2003, based on Mother's guilty plea, a court convicted her for possessing a dangerous drug.   In 2006, Mother was convicted of attempted forgery.   A trial court revoked her deferred adjudication on that charge because Mother again possessed a dangerous drug.   Mother said that she has not been convicted of any crimes during J.H.'s lifetime.

The record contains evidence about CPS's investigations concerning Mother's three other children.   For example, CPS found in previous cases that there was a reason to believe that Mother had been neglectful to her children and had physically abused a child by shaking the child and placing her hand over the child's mouth when the child cried.[16]

As noted above, Mother's parental rights were terminated as to each of her other children.   Mother conceded at trial that her conduct—including her failure to

---

[15]Ornelas said that he has never had a physical altercation with Mother.

[16]Mother said that she never put her hand over a child's mouth to make her be quiet.

19

control her temper, her drug use, and her housing instability—contributed to termination in those cases. Mother had a history of moving around and staying with various men during those cases.

During Mother and Bell's counseling sessions, Mother told Bell that Ornelas did not want her to work at a strip club and wanted her to stop drinking alcohol. Bell wanted Mother to obtain stability for her and J.H. by identifying where they would live without depending on anyone and by learning how to make positive decisions and solve problems through, for example, treating her alcohol abuse and staying away from environments where alcohol might be tempting. Bell became concerned that Mother still had unstable relationships because at one time, she was living with Jose H. but had a relationship with Ornelas.[17]

Bell said that although Mother had expressed a desire to change her behavior and had attained some goals by recognizing her problems, she "didn't appear to have the insight necessary to go from 'I have this problem' to 'I need to solve this problem.'" Bell explained that Mother said that "she had learned from her past mistakes and wanted to do different in the future, but her behavior didn't demonstrate that." Bell said that the counseling sessions with Mother "did not change [Mother's] behavior." Bell concluded that Mother had not "work[ed] to achieve goals for the stability of she and her son." For example, although Mother

_____

[17]Bell said that it was her understanding that Mother "would reside with one gentleman, something would happen, and then she would go to reside with the other one."

20

talked about getting an apartment where she and J.H. could stay, Mother did not do so.

Mother testified that she "can't say that [she] learned a whole lot" from Bell's counseling because she and Bell "didn't really discuss any particular issues or anything." Mother said that she benefited from the parenting and anger management classes that she took. She testified that she is a better person than when she participated in the cases concerning her three other children. However, Mother admitted that the parenting classes did not change her into a good parent and that she is "not fixed."

**J.H.'s physical and emotional needs and Mother's ability to meet them**

Sultana believed that J.H., because of his age, is "very vulnerable" since he cannot "run to find someplace else to be to get away from the danger." She said that Mother's frequent changing of residences while J.H.'s case has been pending, which also occurred in each of Mother's other CPS cases, concerned her. Flores testified that Mother had nine different residences from August 2008 until the trial in September 2009, including staying in the jail and then living with the Spinkses, with Jose H., and at a motel.

Sultana opined that J.H. needs constant supervision and stability and that Mother's living in several locations with different people could affect whether J.H. could form appropriate attachments and develop his identity. Sultana described Mother's history of off-and-on relationships with men and her pattern of having

21

numerous children with different fathers. Flores shared Sultana's concerns about Mother's stability based on her frequent moves. Dr. Wiggins said that she was concerned about J.H. because "a child that does not have stability, not knowing from one day to the next where [the child] may live, . . . that child is going to need someone in an environment that is stable . . . and can meet the basic needs." Dr. Wiggins said that Mother is "deficient in knowing how to provide a safe environment for her children." Dr. Wiggins also concluded that Mother is an "intelligent lady [who] can articulate what she wants to do and what she knows she needs to do. Whether or not she follows through is another issue."[18]

Mother admitted that J.H.'s age makes him vulnerable, but according to Mother, his best interest would be served by his return to her custody because she would "never cause him any kind of harm," he would never "go without," and he has not seen the "downfall of [her] and [her] past." Mother said that she has always been able to provide food and medical care (through Medicaid) to J.H. At the time of trial, Mother had been living in Roanoke with a lady named Deliverance for only three months. Mother said that J.H. could live with her there.[19]

---

[18]Dr. Wiggins admitted that her opinions about Mother were based on her meeting with Mother in January 2009 and that she did not know about any progress that Mother made in the areas that Dr. Wiggins expressed concern about since that time.

[19]Deliverance did not testify.

Mother said that J.H. was "building a temper a little bit" but that he is very happy and loving. Mother testified that she has a crib, a dresser, blankets, and toys ready for J.H. to use if he were returned to her. Mother does not have a driver's license, which concerned Flores about Mother's ability to transport J.H. if an emergency occurred or if she was arrested for driving without a license.[20] As of about a week before trial, Mother had three outstanding tickets for driving without insurance.

Mother lacks support to help her raise J.H. During the course of CPS's case with Mother, it asked her about whether she had a relative who could care for J.H. Mother initially said that she was "concerned about involving her family because she didn't want her family to know that she was involved with CPS again." Mother then said that her sister could possibly care for J.H., but Mother never provided CPS with contact information for her sister.

Ornelas said that he has noticed that Mother copes better with anger since she took anger management, parenting, and counseling classes. Ornelas has encouraged Mother to find a job other than working at a strip club, but he opined that Mother's criminal history impedes her from doing so.

Mother did not miss any visits with J.H. Sultana testified that during the hour-long, once-per-week visits, Mother showed appropriate behavior but struggled to bond with J.H., rarely talked to him or asked him questions, and did

---

[20]Mother indicated that if an emergency occurred, Deliverance or Ornelas could provide transportation.

not "allow him to explore his environment." Sultana believed that Mother's visits with J.H. demonstrated her inability to meet his developmental needs. However, Flores watched a visit between J.H. and Mother in August 2009, a couple of weeks before the trial. J.H. sat on Mother's lap and interacted with her. Flores believed that Mother and J.H. had a bond. Sandra McNeese, a volunteer with CASA (a nonprofit organization that works with children) said that Mother was playful and very loving with J.H. during visits and that Mother told her that she was willing to do whatever it took to get J.H. back. However, McNeese recommended that Mother's rights to J.H. be terminated based on the "history of the case" and the "safety of the child."[21]

Flores said that at the time of trial, Mother was working at Texas Cabaret, a strip club, and was making as little as $400 on a "bad week" and as much as $1,500 on a "good week." However, Mother did not give any pay stubs to Flores so that Flores could verify Mother's employment claims. Flores was concerned about the emotional impact of Mother's working at a strip club on J.H. once he became old enough to realize that she did so.

Mother conceded that her job at the strip club was "not a good job for anybody," and she said that she wanted to get a different job and has applied for other jobs "a couple of times." She indicated that her criminal convictions could prevent her from getting another job. Mother said that if the trial court had

---

[21]J.H.'s attorney also recommended termination of Mother's parental rights.

returned J.H. to her, she would have stayed at home with him until she found a job other than working at a strip club, and when she did find another job, he would go to daycare.

**The foster family's care of J.H. and the Department's plan for him**

Sultana said that J.H.'s foster family had shown interest in adopting him. J.H. developed well in the foster home, which includes a mother, father, and five biological children. In the foster home, J.H. is well-fed, well-dressed, and clean; the foster parents also ensure that he has regular medical and dental care.

Joan Y. said that she and her husband are also interested in adopting J.H. and that she was excited about the possibility of C.Y. forming a bond with J.H., his half-brother.[22] Joan Y. said that she has a room ready for J.H. Sultana believes that either the foster family or Joan Y.'s family could make J.H. feel important and unique.

**The summary of the evidence that could support the jury's determination about J.H's best interest**

As part of her argument, Mother contends that she has "demonstrated that she is able to provide a safe environment for the child, both through her actions in leaving the child with the Spinks family . . . as well as through her testimony regarding her thoughts on providing a home for the child in the future." But while Mother's leaving J.H. with the Spinkses allowed him to stay in a home where he

---

[22]During J.H.'s case, CPS filed a motion to transfer J.H. from his foster home to Joan Y.'s home; the trial court denied the motion.

was indeed happy and healthy, her decision to stab Jose H. caused her confinement and precipitated the need for J.H. to stay with the Spinkses in the first place. Although Mother testified that she was defending herself when she stabbed Jose H., Officer Howze testified that when he talked to Mother, she smelled like alcohol (and Jose H. did not), admitted that she had been drinking heavily, was nervous, was uninjured, and was without any marks on her neck. Also, the State requested dismissal of Mother's aggravated assault case because it was "[u]nable to locate [the] injured party," not because of Mother's self-defense claim.

Thus, the jury, which was able to view Mother's demeanor, could have reasonably disbelieved her self-defense testimony. *See H.R.M.*, 209 S.W.3d at 109 (explaining, in a factual sufficiency review of a termination decision, that the jury is the sole arbiter when assessing the credibility and demeanor of witnesses and may therefore disregard a parent's testimony) (citing *In re J.L.*, 163 S.W.3d 79, 86–87 (Tex. 2005)). And even if the jury believed her testimony, it still could have reasonably determined that Mother might have future assaultive behavior. Mother admitted that she had previously assaulted men. Also, Sultana saw Mother fighting with Jose H. in the CPS parking lot during the time that Mother was attending anger management and parenting classes. When J.H.'s attorney asked Mother, "So how do I know you're not going to have family violence issues in the future?" Mother responded, "You don't."

As for Mother's plans for J.H.'s future, Mother had been living with Deliverance for only three months at the time of the trial; Mother also had nine different residences from August 2008 until the trial in September 2009. The jury could have rationally decided that Mother's lack of a permanent, independent home could cause her to change residences as she had in the past. *See In re M.R.J.M.*, 280 S.W.3d 494, 502–03 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g) (stating that "[c]onduct that subjects a child to a life of uncertainty and instability . . . endangers the child's physical and emotional well-being" and explaining that a factfinder may rely on past conduct to infer that similar conduct will occur in the future); *In re S.B.*, 207 S.W.3d 877, 887 (Tex. App.—Fort Worth 2006, no pet.) ("Evidence of a parent's unstable lifestyle can support a factfinder's conclusion that termination is in the child's best interest."). Mother was dating Ornelas, who encouraged her to find a different job and stop drinking alcohol, but when Ornelas was asked what his plan with Mother was, he said that he "never really saw [himself] in this kind of situation . . . having to support somebody who's been through so much in their life." He said that he did not plan to marry Mother but instead wanted to "take it one day at a time and see how things end up." And Mother admitted that her relationship with Ornelas "has its flaws."

Mother expressed interest in finding a job other than working at a strip club but had not done so in the nearly ten months between the date that the Department filed its petition and the trial. She said that she would stay home

27

with J.H. while she found a different job, but she did not explain how she would provide for J.H.'s needs in the meantime. The jury also could have inferred that Mother would not provide J.H. with a safe environment based on her three previous termination cases, in which the factfinder found that she endangered her children. *See In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.) ("[C]ourts look to what the parent did both before and after the child's birth to determine whether termination is necessary.").

Next, the jury could have determined that Mother's substance abuse issues would cause danger to J.H. if he were returned to her. Although Mother said that she had not used drugs in the two years preceding the trial, she admitted that she had previously been clean for about a year and a half—from May 2004 to January 2006—before relapsing. Mother conceded that she has a pattern of periodically not using drugs and then using them. Also, Mother said at trial that she planned to stop drinking alcohol but conceded that she could not say that she was "fully not drinking." Mother failed to complete her CATS drug treatment classes even though she knew that doing so was important to achieve J.H.'s return to her custody. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) (explaining that failure to comply with a service plan may support a finding that termination is in the best interest of the child). And although Mother told Bell that she did not attend CATS because she wanted treatment specifically related to alcohol, she told Dr. Wiggins that she has never attended Alcoholics Anonymous meetings, and the record does not show that

28

she sought other treatment particularly related to alcohol. Thus, although Mother promised the jury that she would not use drugs again, they could have reasonably decided that her promise was not likely to be fulfilled.

For all of these reasons, although we recognize that some evidence shows a recent improvement in Mother's lifestyle, we hold that, in giving due deference to the jury's determination and not supplanting its decision with our own, the totality of the evidence detailed above allowed the jury to reasonably form a firm conviction or belief that termination of Mother's parental rights is in J.H.'s best interest. *See* Tex. Fam. Code Ann. § 161.001(2); *H.R.M.*, 209 S.W.3d at 108; *In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (explaining that a father's "efforts to improve his ability to effectively parent on the eve of trial [were] not enough to overcome a decade of poor parenting and neglect"). Therefore, we overrule Mother's second issue.

## Conclusion

Having overruled both of Mother's issues, we affirm the trial court's judgment.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and MCCOY, JJ.

DELIVERED: September 16, 2010

29